J-S54034-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CALVIN MALLORY, JR. | : | No. 269 WDA 2017 |

Appeal from the PCRA Order January 11, 2017
In the Court of Common Pleas of Somerset County
Criminal Division at No(s): CP-56-CR-0000319-2011

BEFORE: OTT, MOULTON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED DECEMBER 26, 2017**

Appellant, Calvin Mallory, Jr., appeals from the order of the Somerset County Court of Common Pleas denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Appellant contends, *inter alia*, that defense counsel provided ineffective assistance during trial by failing to object to testimony by a Commonwealth witness of other murders that Appellant allegedly committed or ordered. We agree with Appellant that defense counsel provided ineffective assistance that resulted in prejudice. Therefore, we reverse the PCRA court's order, vacate the judgment of sentence, and remand for a new trial.

---

[*] Former Justice specially assigned to the Superior Court.

**FACTUAL AND PROCEDURAL HISTORY**

**1. Procedural History**

Appellant was charged with first degree murder,[1] two counts of conspiracy to commit murder in the first degree,[2] and one count each of corrupt organizations,[3] sale of a non-controlled substance[4] and criminal use of a communication facility.[5] The jury found Appellant guilty of all charges following a four-day trial. The trial court sentenced him to a mandatory term of life imprisonment for first degree murder followed by a consecutive term of two to ten years' imprisonment. On direct appeal, this Court affirmed, and our Supreme Court denied Appellant's petition for allowance of appeal. ***Commonwealth v. Mallory***, 97 WDA 2013 (Pa. Super. Mar. 19, 2014) (unpublished memorandum), *appeal denied*, 203 WAL 2014 (Pa. Oct. 6, 2014).

Appellant filed a timely PCRA petition alleging ineffective assistance of trial counsel due to unreasonable trial strategy. On April 27, 2016, the PCRA

---

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 903. One count alleged a conspiracy between Appellant and Toriano McCray, and the other count alleged a conspiracy between Appellant and Roland Washington.

[3] 18 Pa.C.S. § 911(b)(3).

[4] 35 P.S. § 780-113(a)(35)(ii).

[5] 18 Pa.C.S. § 7512(a).

court held an evidentiary hearing during which trial counsel testified. In an order and opinion issued on January 11, 2017, the PCRA court denied Appellant's PCRA petition. Appellant filed a timely appeal to this Court, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

## 2. Factual Background

Appellant's conviction arises out of the shooting death of Bryant Adderley inside his apartment in August 2008. Police officers recovered a package of fake cocaine at the scene. About one week after the discovery of Adderley's body, Ronald Ziegel was arrested in Fayette County on an unrelated charge. Ziegel provided information that resulted in the arrests of Appellant, Washington and McCray.

The PCRA court describes the evidence adduced during trial as follows:

> On July 21, 2011, the then-District Attorney of Somerset County filed an Information charging [Appellant] with multiple crimes arising out of the death of Bryant Adderley. In essence, the Commonwealth alleged that [Appellant] headed an illegal drug distribution ring based out of Brooklyn, New York, and Bryant Adderley "worked" locally for [Appellant] as a dealer. According to the Commonwealth's theory of the case, Adderley had been stealing money from [Appellant] so [Appellant] ordered Adderley's murder by instructing Roland Washington and Toriano McCray to shoot Adderley.
>
> Robert Lee Ziegel, the prosecution's chief witness, drove Washington and McCray to Adderley's residence on the day of the murder. Ziegel initially was a marijuana smoker who sold marijuana on the side to finance his drug habit. Ziegel found, however, that he was unable to financially make ends meet, even with working a legal job and selling marijuana. He, therefore, decided to start selling crack cocaine as well. Ziegel's cocaine supply was purchased in

- 3 -

part from Pittsburgh suppliers and in part from Bryan Maust, a local dealer who worked for [Appellant]. Maust eventually introduced Ziegel to [Appellant], at which time [Appellant] stated his interest in employing Ziegel as one of his dealers.

About two months after [Appellant]'s and Ziegel's first meeting, [Appellant] contacted Ziegel and instructed him to drive Maust to a farmhouse near Jennerstown, Pennsylvania. At the farmhouse, [Appellant] offered to supply Ziegel with cocaine for a lesser price than Ziegel had been paying his Pittsburgh suppliers. Also present at the farmhouse meeting was an associate of [Appellant]'s named "B-Bop."

In the time following the farmhouse meeting, Ziegel's dealing enterprise began to expand, eventually employing around five people as distributors. Ziegel went from acquiring one ounce to four ounces of cocaine at a time from [Appellant]'s dealers, after which [Appellant] informed Ziegel that he would have to come to Brooklyn to "re-up." [Appellant] also instructed Ziegel to transport to Brooklyn money owed to [Appellant] by Maust. The amount of cocaine [Appellant] supplied Ziegel eventually increased to a kilo at a time.

Later, [Appellant] instructed Ziegel to meet him at the Jennerstown farmhouse again, which is where Ziegel first met Bryant Adderley, or "B-Dave." [Appellant] told Ziegel that Ziegel was traveling too much with too much product, so [Appellant] was going to position Adderley nearby with drugs so that Ziegel would not have to travel as far to "re–up." At that point, [Appellant] also gave Ziegel a quarter-pound of heroin and instructed him to sell it. Ziegel only sold the heroin for a month or so, however, because too many people in the area were overdosing on it. Ziegel reported this to [Appellant], and [Appellant] decided to stop selling the heroin in the area.

One of [Appellant]'s shipments subsequently got "busted," and Ziegel was informed that he would not have any product for about two weeks. Ziegel was given five pounds of marijuana to sell in the meantime, which was worth $10,000. Because Ziegel had saved enough money

to cover the cost of the marijuana, he decided to take a vacation to Ocean City, Maryland with his girlfriend (Amy Johnson), and two other people, one of whom worked for Ziegel as a "crew member." In Ocean City, a police officer saw Ziegel sitting in a vehicle rolling a "blunt" (a cigar with the tobacco removed and marijuana inserted). Ziegel admitted to the officer that the marijuana belonged to him. Ziegel was taken to jail, where a DEA agent offered him a deal[6] in exchange for information as to who had sold Ziegel the marijuana. Ziegel declined and went to jail instead, staying for two weeks before he was finally bailed out by [Appellant] via Ziegel's wife, at ten percent of the $50,000 bond.

At this point, Ziegel owed [Appellant] $10,000 for the marijuana and $5,000 for the purchase of the bail bond. Ziegel went to Brooklyn and repaid [Appellant], after which [Appellant] gave Ziegel ten ounces of crack cocaine to help him "get back on [his] feet." [Appellant] also informed Ziegel that he had earned his "first stripe" for getting locked up and not rolling over under pressure from the DEA.

About a month later, Ziegel was again arrested and charged, this time by the Pennsylvania State Police, with selling crack cocaine to a friend. While the Pennsylvania charges were pending, Ziegel briefly moved back into his parents' home, and began working with his father at Hidden Valley Resort on the maintenance crew. It was at that point that Maust contacted Ziegel, again on [Appellant]'s behalf. Ziegel was nervous because he knew that he still owed [Appellant] $12,000 for the ten ounces of crack cocaine [Appellant] had given him to get back on his feet. Maust transported Ziegel to a location in Donegal, where [Appellant] was waiting.

[Appellant] asked Ziegel if he was ready to begin selling again, to which Ziegel replied that he guessed so. [Appellant] at this point also allegedly threatened to smash

---

[6] The DEA agent was investigating because a large amount of marijuana had been found in the trunk of Ziegel's vehicle.

a beer bottle into Maust's face because Maust had used an ounce of heroin instead of selling it. Maust was given a week to get the money to [Appellant]. However, [Appellant] made no mention at that point of Ziegel's debt. [Appellant] shortly thereafter began supplying Ziegel with two ounces of cocaine at a time to sell. Ziegel claimed to have been given his second stripe after his second bust; that is, he was promoted to "General" within [Appellant]'s organization.

Ziegel returned to selling drugs full-time. Later, the Fayette County Drug Task Force showed up at Ziegel's residence where he was found in possession of sixteen grams of marijuana. Ziegel indicated that he could do his time, but that he wanted out of "this lifestyle," after which he agreed to cooperate with the authorities. However, nothing much came from his agreement to cooperate. As Ziegel described it, "I just kept putting it off basically . . . I said, I got to keep doing what I'm doing to make it look good. And [the officer] said, he can't promise me nothing, but he said that they'll lay off me."

Subsequently, Ziegel met up with [Appellant] at the "Trent Residence," a house located on Trent Road in Bakersville, Pennsylvania. Ziegel was invited in by a man named "Sheik." [Appellant] and Adderley were in the bathroom, and Ziegel overheard them discussing a deal: "I heard them say something about they don't trust it. I heard about offing it . . . And at the end I just heard let's give him a choice. That's . . . the extent of the conversation I heard." Ziegel believed they were talking about him. After the discussion between [Appellant] and Adderley, [Appellant] came out of the bathroom and offered Ziegel a position in Erie, Pennsylvania. Ziegel's choice became: go to New York to pick up a kilo or go to Erie. Ziegel accepted the Erie post, figuring that if he went to New York, he would never come back.

Business continued more or less as usual through 2009. One day, [Appellant] called Ziegel out of the blue and asked him to come to New Jersey as soon as possible. Ziegel caught a ride to Columbus, Ohio, where he met up with a woman who had [Appellant]'s Yukon Denali, which Ziegel then drove to Perth Amboy, New Jersey. Ziegel met

[Appellant] there, along with Roland Washington and Toriano McCray. Ziegel had never met McCray before, but he had met Washington at least once. Ziegel testified that [Appellant] sat him down, "and he's talking about B-Dave. He's like, he's been shorting me money. I don't know why he's screwing around like this. You know, we got to teach him a lesson because he's, he's kind of telling me what I needed to do." Ziegel next testified that the plan was to package up fake cocaine and then he, McCray, and Washington were to go to Somerset to deliver the fake cocaine to Adderley and "get the money off of him."

Ziegel testified that he helped "puck" up the package of fake cocaine. Pucking had been explained as follows:

> Well, what a puck is, there's a device called a puck press. It has a hydraulic pump, and there's a little round device on top, where there's a hole here. Kind of looks like a hockey puck. Put the powder in it, you screw a top on, a solid metal top, and you move the jack, and it jacks it up and compresses it into a form of a puck.
>
> [M]ost people who do drugs like their powder in rock form. So if you cut it, you got to break it down into powder, and then to get it hard again you have to what's called puck it, press it.

Ziegel indicated that the procedure is to take pure powder cocaine, to cut it with something, "[u]sually procaine," and then puck it. So Ziegel testified that the plan was to take fake cocaine and puck it to give it the appearance of real cocaine, and then take it to Adderley in exchange for money: "Me and [Appellant] packaged it . . . Baking soda . . . Because he didn't want to waste his money trying to puck up cocaine because it cost too much." Ziegel agreed that they had trouble packing it: "Baking soda won't compress. As soon as we puck it up, it would just fall back apart. I tried putting hair spray in it to try to hold it together. That didn't work. So . . . it wouldn't puck up."

McCray testified that what Ziegel had packed up was cocaine. McCray knew it was cocaine because he took some to the bathroom and used it without anyone else

knowing. McCray testified, "I know it was real cocaine because I was usin' it. I snuck some and was usin' it . . . I did drugs from years ago. I know what cocaine is . . . ." McCray knew, then, that the drugs that they had packaged up in Brooklyn to take to Adderley were real.

The trio retrieved two guns in Perth Amboy, which Washington and McCray carried. Ziegel at this point believed that the plan was to rob Adderley rather than murder him. But Washington testified that when they left New York with the guns, it was his understanding that they were supposed to murder Adderley, per [Appellant]'s instruction. Washington corroborated Ziegel's testimony that the plan was to rob Adderley. But, according to Washington, they were also to murder Adderley at [Appellant]'s request, and for free. However, McCray testified that [Appellant] offered the parties "a large amount of money" to murder Adderley, more specifically, they would receive $50,000 or $60,000 for the homicide, which they could retrieve from Adderley's Johnstown apartment after the murder.

Adderley was not home when the trio first arrived, so they drove around and returned later, at which point, Adderley had returned. As Ziegel narrated:

> Washington and McCray grab the box of fake cocaine, and they walk up to the door. . . It's still early in the morning, probably about 8:30, 9, sometime . . . I'm sitting out in the car. I was smoking a cigarette, waiting for them to come out . . . I'm sitting in there smoking my cigarette, and the next thing you know, I hear six, seven gunshots right in a row. And a little bit after that, they come walking out like nothing even happened, hop back in the car, told me to pull out and drive, drive slow.

According to McCray, he and Washington entered Adderley's home. Washington handed Adderley the product, and McCray asked if he could use the bathroom. While McCray was in the bathroom, he heard Adderley yell

"What the 'F' is this?" after which he exited the bathroom to see Adderley facing away, examining the bag. When Adderley turned around, McCray fired.[7] According to McCray, at that point, he still did not know that the drugs were fake.

The parties drove off and disposed of the evidence, after which they went to Adderley's other apartment in Ferndale, Pennsylvania. Ziegel could not recall whether [Appellant] had called someone in the car or vice versa, but Ziegel was handed a phone, and [Appellant] was on the other end of the line asking "how the Godfather Part II went, jokingly; and I said all right because I didn't know what else to say. And I handed the phone back to McCray." As Ziegel put it,

> We all go up to the apartment. I wait in the living room and they go back in the bedroom and change into different clothes, and they were looking for something. I, I don't know what that something was. So they finish up. And we all leave. We all get back into the car. . . . We head back to Perth Amboy, New Jersey.

The three eventually found [Appellant] in Brooklyn. Ziegel smoked some marijuana and drank some vodka to calm his nerves while [Appellant] prepared "the next little package" for Ziegel to leave with so Ziegel would not have to return anytime soon. Ziegel wanted to leave immediately to go back to Erie, but [Appellant], McCray, and Washington took a vote, deciding that Ziegel was required to stay and rest up before he left. Ziegel was arrested two days later. Ziegel had slept for most of his first day back in Erie. The next day, he went out "to kind of clear my mind and everything, and ended up getting stopped by the Game Commission." About six days later, on August 25, 2009, he gave a statement to the police implicating [Appellant] in Adderley's murder. Ziegel testified at [Appellant]'s preliminary hearing under a grant

_____

[7] Defense counsel objected to publication of photographs depicting Adderley's dead body because of their "shock value." N.T., 4/10/12, at 61-62, 85.

of immunity, and on February 16, 2012, Ziegel pleaded guilty to third degree murder.

PCRA Ct. Op., 1/11/17, at 1-9 (citations omitted). Washington and McCray both testified for the Commonwealth, and both pleaded guilty to third degree murder for their roles in Adderley's death. N.T., 4/11/12, at 91, 161-62.

### 3. Testimony During Trial Concerning Other Murders

We now turn to the testimony by Ziegel that lies at the heart of this appeal—testimony that the deceased, Adderley, committed a murder at Appellant's request, and Appellant himself committed a gruesome murder by injecting a victim with battery acid.

During the Commonwealth's direct examination, Ziegel testified, without objection, that Adderley "took a homicide" for Appellant on a prior occasion. N.T., 4/10/12, at 138-39. Ziegel then testified, without objection, that he also witnessed Appellant commit a murder in New York by injecting the victim with battery acid, a so-called "hot shot":

BY THE DISTRICT ATTORNEY:

Q. Were you ever present in New York when a hot shot was administered?

A. Yes, I was.

Q. Explain to the jury what a hot shot is.

A. A hot shot is a needle filled with battery acid.

Q. What kind of needle?

A. A hypodermic needle or an insulin needle.

Q. And what did you see?

A. Shortly after I got busted in [Ocean City,] Maryland, I got out and went back up there, up to Brooklyn; and after I explained to them what happened and everything, we went for a ride. And it was me, B-Dave [the deceased, Mr. Adderley], B-Bop and [Appellant]. And John Barden (PHONETIC) actually did tell me to stop, there he is.

Q. You're driving the car?

A. Yes. Said stop. There he is. They get out. B-Dave and B-Bop hold a guy down while C [Appellant] injects him with a syringe.

Q. He injects him with what?

A. A syringe.

Q. And what happens?

A. The guy stops moving after a little bit and they prop him up against the Dumpster and get back in and tell me to go.

Q. And what do they say?

A. I can't remember exactly what was said. But it was to the point, let that be a lesson. Don't mess with us or something like that. I can't exactly remember.

Q. And do you think that was a message for you in the sense that you had just been released again from prison?

A. That's the way I took it.

*Id.* at 140-41. We see nothing in the record indicating that the Commonwealth notified defense counsel, prior to or during trial, of its intent to introduce this testimony. Nevertheless, defense counsel did not object to this testimony or move for a mistrial. *Id.* at 138-41.

During Ziegel's cross-examination, defense counsel asked questions designed to demonstrate that Ziegel's "hot shot" testimony was incredible:

> A: Well, like I stated before, I still wasn't fully set on getting out [of the drug operation]. It wasn't till I seen people in our own organization getting shot that kind of has a way to set your—
>
> Q: So after [Adderley] was murdered, then it occurred to you that this was probably not a good plan?
>
> A: Yes. That I wanted definitely to get out.
>
> Q: When you saw a guy held down and have battery acid shoved into his arm and dumped into an alley in Queens, it never occurred to you, this was a bad idea? The money was still good?
>
> A: Yes, that did occur to me; but like I said, I was never dead set on doing it.
>
> Q: But the money was still as attractive even though you just saw somebody who you never saw again have battery acid shoved into his vein, that didn't tell you: I got to stop and quit right here? You kept going?
>
> A: Yes, I kept going.

N.T., 4/10/12, at 289-90.

### 4. Closing Argument

During closing, defense counsel argued that Appellant's "hotshot" testimony was unworthy of belief:

> And while they [Appellant, his co-conspirators, and others] were there in New Jersey and New York barbecuing, drinkin' beers, smoking, some extra people came in there . . . Lots of people were there. They were hanging out. During this time . . . [Adderley] arrives . . . They went to Coney Island together . . . They're hanging out. You're a

> pal. We're having barbecue. We're doing this. We are taking day trips.
>
> If you wanted to really kill Bryant Adderley, why not do it there? Why not kill him right there? I wasn't really sure what happened to that guy who got the hot shot, but they pumped his arm full of battery acid and dumped him in an alleyway in Queens, New York, near a dumpster. Sounds like there were easy opportunities to get rid of someone there versus anywhere else. I mean it was a possibility.
>
> And everybody said: Best friends. [Adderley] and [Appellant], best friends. Great friends . . . That's pretty nice. And when he's up in New York and New Jersey and they go to Coney Island, still everything is okay. And two days later, he would be back in Somerset and would [Appellant] send three guys there to kill him? I would argue to you that's unlikely.

N.T., 4/12/12, at 20-21.

Defense counsel's theory of the case was that Appellant was a drug dealer who had sent three of his crew to Somerset, Pennsylvania to deliver cocaine. Ziegel cooked up a scheme whereby he and the two gunmen would deliver fake cocaine to Adderley, take the money, and leave. However, Adderley realized that the drugs were actually fake and confronted the two gunmen, who shot him to death and fled in a vehicle with Ziegel. When it became clear that police believed they had planned to murder Adderley, they blamed Appellant to facilitate a deal to plead guilty to third degree murder. Defense counsel articulated this theory as follows during his closing argument:

> So they package up their cocaine, so Mr. Ziegel says, and we were all packaging up fake cocaine. But Toriano McCray, he had a little bit more information about the

- 13 -

packing of cocaine in New Jersey than anybody else. He said, Hey, I took some of that cocaine; it was cocaine; it wasn't baking soda. I've done coke before. I know what it was.

So it was real cocaine . . . It was a . . . regular delivery. Nothing more and nothing less. But Mr. Ziegel needed $12,000 and he needed it bad. He needed it so bad that he figured: I'll take the ten ounces you gave me of real cocaine that I pucked up and I'll also have my own supply of fake cocaine that I've pucked up. And I'll hand these two guys that come with me, who are supposed to deliver real cocaine and pick up real money, I'll hand them the fake cocaine and we'll get his money and we'll have the drugs and I can go back to doing business in Erie County . . .

Now, we have a bit of a problem here . . . in the moments described by Toriano McCray, you might want to double-check that. Because, as I said . . . Toriano McCray went into the bathroom [at Adderley's residence] . . . [and] Toriano [had previously] picked up[] real coke. And he walked in and he went to the bathroom and he heard the voice of [Adderley] saying . . . "What the fuck is this?". . . It took . . . a half a second for [Adderley] to realize that this was fake. This wasn't real.

Mr. Ziegel talked about how everybody pretty much was armed. And before a problem ensued, as soon as he heard that, Toriano McCray said: I was out of the bathroom firing my gun . . . But the reality is: In that second . . . that was a defensive move. That was a move of: I didn't think that this guy was going to look in the box that quickly and I didn't know what the problem was because I think this is real coke. But I'm coming out to make sure that I don't get shot by somebody. And that's what Toriano McCray did. This was to be a robbery and they were going to steal his drugs and money. But this thought process belonged solely to Rookie, Mr. Ziegel. It's his plan. I'm going to rob them and I'll have the drugs and money and I'm half-baked on coke, so I'm completely protected here. And we are going to rob this guy. And that robbery went bad. It went real bad. It went bad very fast.

- 14 -

And I know that Toriano McCray said: Oh, yeah, I saw them package up real coke. I know he said that. But I believe that Toriano McCray [then] knew what they were going to deliver was fake coke for a robbery. And you want to know why? . . . They took the time to get [the victim's] keys, his wallet and his cell phone. If you thought that was real coke, you would take that with you, too. That's worth $10, $12,000. It's ridiculous not to take that box with you. And it leaves more of a mystery for the police, quite frankly, because now they just have a dead body. They don't have anything . . . .

Ladies and gentlemen, this was a robbery to steal drugs and money and that plan was hatched by one person: Mr. Ziegel. And Mr. Ziegel had plenty of opportunity to convince two poor guys, McCray and Washington, that they can make money off of this deal. They were both out of work. They were not connected into this operation. They weren't Generals . . . They were nothing. And they had a chance to make some quick money. I would argue to you that this murder was not as intentional as it seemed. It was a robbery gone bad, pure and simple, hatched by Ziegel, hatched by Rookie so that he could have his drugs, get money, and nobody else could get it and be ready to go.

*Id.* at 22-26, 33.

### 5. Evidentiary Hearing On PCRA Petition And PCRA Court's Decision

Defense counsel noted that Appellant was charged with two substantial charges: first degree murder and running a drug dealing operation. N.T., 4/27/16, at 25. Defense counsel contended that his first priority was to "beat the murder-one charge" because a conviction for this offense would mandate life imprisonment without parole. *Id.* He elaborated that "the strategy going on was simple. I'm not a murderer. I didn't direct anybody

to commit a murder on my behalf. I may be a drug dealer, but I'm not going to kill my best friend." *Id.* at 26.

PCRA counsel asked why trial counsel remained silent during Ziegel's testimony about the "hot shot" murder. Defense counsel answered:

> I believe that every word that came out from Mr. Ziegel's mouth was either a lie or an exaggeration or an imaginary, I'm a bigger person than you know.
>
> I spent a lengthy time[,] I believe[,] at sidebar[, and] both the DA and I were admonished for how long it took to get through his testimony. And because I needed to establish that every word that came out of it was pure unmitigated garbage, that he was not credible on a shot.
>
> The fact that he's telling tales out of school, this is the same person who explained how suddenly he got promoted every time he got arrested and charged criminally; that [Appellant] somehow would say, oh, now that you've been arrested and criminally charged and you're costing me more money and lost drugs, that somehow I'm going to make you a lieutenant in the organization and move you up because you're impressing me with your skill as a drug dealer for me.

N.T., 4/27/16, at 49. PCRA counsel also inquired as to why defense counsel did not object to the other homicide testimony, and defense counsel explained:

> More puffery and nonsense from Mr. Ziegel about what a big, bad—I want to say ass—drug dealer he was. Look how cool I am, I go to New York, I talk about murders, murders being committed left and right and how tough we are. On cross-examination I believe I established, not convincingly to the jury, that pretty much his story didn't make any sense. I'm getting promoted up through failure; and I think that's exactly what I argued at closing argument, that he was being promoted up through his failure as a drug dealer.

*Id.* at 50-51.

PCRA counsel argued that defense counsel had no reasonable basis for failing to object to the "hot shot" evidence and the evidence that Adderley committed murder at Appellant's direction. *Id.* at 84. PCRA counsel added: "I can't believe that [this evidence] wouldn't have made a difference in this case. When your client has now been admitted to have committed [or been] involved in two other murders . . . the jury [is] tainted beyond measure at that point [and is] going to issue a guilty verdict . . ." *Id.*

The PCRA court responded:

> So if I understood [defense counsel] correctly, he said I didn't object to those sensational stories that Ziegel was telling because he was just making that stuff up because he was a liar and he wanted to look good. So if that's the defense theory and that's why he didn't object, okay, I understand that. But then, to be honest, as I'm sitting here now, you know, I have to say that, doggone, the stuff that came out, those lies, if that's what they were, sure seemed awfully damaging.

*Id.* at 92. The court added:

> [E]ven [defense counsel's closing] argument was consistent . . . with what he is describing as his strategy today, which is that they're all liars and everything they say is a lie. My guy didn't do it. He wasn't there. They're all lying. That was the defense theory. My question becomes: well, if that was the theory and that was the strategy, what happens when you let in stuff that's so damaging, that it—I mean even I was thinking to myself, ouch . . . .
>
> I want[] to know if there was a case out there, that I'll call the "ouch" case now, that says when it's that bad, you have to overlook strategy.

- 17 -

*Id.* at 93, 94.

Ultimately, the PCRA court determined that defense counsel had a reasonable trial strategy:

> [A]ccording to the defense's theory of the case, Ziegel himself had orchestrated the robbery-gone-wrong. It was therefore important to highlight the inconsistencies in his account of the murder, including, *e.g.*, the fact that [Appellant] and Adderley were on good terms just days before the murder; Ziegel testified that he had pucked up fake cocaine with [Appellant] in order to dupe Adderley, however McCray testified that the cocaine that was pucked up was real cocaine—yet, nevertheless, fake cocaine ended up at the scene of the murder; and that if [Appellant] had allegedly committed a prior murder without detection in New York, then he could have committed this murder in the same manner instead of ordering the murder as Ziegel described. [Defense counsel] also emphasized inconsistent and incredulous aspects of Ziegel's story generally, *i.e.*, that Ziegel had repeatedly cost [Appellant] money and drugs, but purportedly continued to get promoted in the organization; that Ziegel had witnessed a murder and heard about another, but that was not enough to cause Ziegel to extricate himself from the organization, yet his participation in Adderley's murder was, for an undetermined reason, sufficient for Ziegel to report [Appellant] to the police.
>
> [Defense counsel] had a coherent theory of the case, and we cannot say that the method he chose to present his theory of the case had no "reasonable basis designed to effectuate his client's interests." . . . In viewing [defense counsel]'s actions "in light of all the circumstances," we similarly cannot say that "the identified acts or omissions were outside the wide range of professionally competent assistance," . . . even though [defense counsel]'s strategy carried considerable risks.

PCRA Ct. Op. at 26.

## DISCUSSION

## 1. Questions Presented And Standard Of Review

Appellant raises the following questions on appeal:

A. Whether, under both Pennsylvania and federal law, former trial counsel was constitutionally ineffective, thus, requiring vacation of conviction and grant of new trial, where former trial counsel's stated trial strategy as revealed at the PCRA evidentiary hearing in this matter was pure afterthought[?]

B. Whether, under both Pennsylvania and federal law, former trial counsel was constitutionally ineffective, thus, requiring vacation of conviction and grant of new trial, where assuming former counsel's statement of trial strategy to be true, trial counsel's highly prejudicial conduct at trial, including, but not limited to, his failure to object to and, in fact, even, himself, eliciting evidence of alleged prior bad acts regarding his own client, in no way advanced counsel's stated trial strategy[?]

C. Whether, under both Pennsylvania and federal law, former trial counsel was constitutionally ineffective, thus, requiring vacation of conviction and grant of new trial, where, whether advancing trial strategy or not, former counsel's conduct at trial, including, but not limited to, his failure to object to and, in fact, even, himself, eliciting evidence of alleged prior bad acts regarding his own client, was so prejudicial that it so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place[?]

D. Whether, under both Pennsylvania and federal law, former trial counsel was constitutionally ineffective, thus, requiring vacation of conviction and grant of new trial, where the cumulative effect of all errors committed by trial counsel before and during trial so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place[?]

Appellant's Brief at 6-7.

A PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Our standard of review of a PCRA court's dismissal of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and free of legal error." ***Commonwealth v. Wilson***, 824 A.2d 331, 333 (Pa. Super. 2003) (*en banc*) (citation omitted).

> It is well settled that
>
>> counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. ***Strickland v. Washington***, [ ] 104 S. Ct. 2052, [ ] (1984). This Court has characterized the ***Strickland*** standard as tripartite, by dividing the performance element into two distinct parts. ***Commonwealth v. Pierce***, [ ] 527 A.2d 973, 975 ([Pa.] 1987). Thus, to prove counsel ineffective, [the a]ppellant must demonstrate that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) [the a]ppellant was prejudiced by counsel's act or omission. ***Id.*** at 975.

***Commonwealth v. Koehler***, 36 A.3d 121, 132 (Pa. 2012). "If a petitioner fails to prove any of these prongs, his claim fails." ***Commonwealth v. Simpson***, 66 A.3d 253, 260 (2013) (citation omitted).

Generally, counsel's assistance is constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. *See Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010). Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Colavita*, 993 A.2d 874, 887 (Pa. 2010) (quotation and quotation marks omitted). To sustain a claim of ineffectiveness, counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Ervin,* 766 A.2d 859, 862-63 (Pa. 2000).

To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Commonwealth v. King*, 57 A.3d 607, 613 (Pa. 2012) (quotation marks and citation omitted). "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Ali,* 10 A.3d at 291 (citation omitted). The test for prejudice in the ineffectiveness context is more exacting than the test for harmless error:

> [A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it 'could have reasonably had an adverse effect on the outcome of the proceedings.' This standard is different from the harmless error analysis that is typically applied

when determining whether the trial court erred in taking or failing to take certain action. The harmless error standard, as set forth by this Court . . . states that "[w]henever there is a '**reasonable** possibility' that an error 'might have contributed to the conviction,' the error is not harmless." This standard, which places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt, is a lesser standard than the . . . prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel. In a collateral attack, we first presume that counsel is effective, and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel.

*Commonwealth v. Spotz*, 84 A.3d 294, 315 (Pa. 2014) (citations omitted).

We address the first three issues on appeal together, because they relate to the same issue: whether defense counsel provided ineffective assistance by permitting Ziegel to testify, without objection, about Appellant's "hot shot" murder and the murder that Adderley committed at Appellant's direction. We conclude that counsel provided ineffective assistance, thus necessitating a new trial.

### 1. Arguable merit

Appellant's claim of ineffective assistance has arguable merit. The normal channel for admitting evidence of prior bad acts is Pa.R.E. 404(b)(2), which provides that evidence of crimes other than the charged offenses "may be admissible for purpose[s] such as proving motive, opportunity,

intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." In addition, Rule 404(b)(2) permits admission of prior offenses under the *res gestae* exception, "where the evidence became part of the history of the case and formed part of the natural development of the facts." ***Commonwealth v. Cousar***, 154 A.3d 287, 304 (Pa. 2017). "In a criminal case," however, evidence of prior crimes "is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). We cannot see how the evidence in question fits within any Rule 404(b)(2) exception. For example, we do not think that the "hot shot" murder was part of the natural history of this case; it is a horrific, but completely unrelated, act of violence. The Commonwealth implicitly appears to agree that this evidence is irrelevant, for it makes no argument in its brief that it was admissible under any rule of evidence. Further, assuming that it met any test of relevance, its potential for prejudice far outweighed its probative value, a subject we discuss in greater depth below.

### 2. Lack of reasonable trial strategy

Defense counsel testified at the PCRA hearing that he refrained from objecting because he thought Ziegel's testimony was patently incredible, and that he could expose Ziegel as a liar during cross-examination and closing argument, thus persuading the jury to acquit Appellant on the most serious

charge of murder. The flaw in this rationale is that this testimony—particularly the inflammatory evidence of the "hot shot" murder—poisoned the jury's view of Appellant. No longer did he look like a drug dealer; he now was branded as a sadistic, cold-blooded killer. The PCRA court itself recoiled at this evidence: "[E]ven I was thinking to myself, ouch . . ." N.T., 4/27/16, at 93. Not surprisingly, the jury took only one hour and forty-six minutes, including a lunch break, to reach its verdict of guilt. N.T., 4/12/12, at 76-77.

Two decisions influence our analysis. First, in ***Commonwealth v. Moore***, 715 A.2d 448 (Pa. Super. 1998), the jury found the defendant guilty of robbery, attempted murder and other crimes arising from a home invasion. ***Moore***, 715 A.2d 449-50. A police lieutenant testified, without any objection, that the defendant's housemate told him that the defendant was on probation or parole, which led the police to pull the defendant's photograph from department files. ***Id.*** at 450-51. The lieutenant also testified that the defendant requested that his parole officer be present at the time he made his statement to the police. ***Id.*** at 451. The defendant's parole officer testified that he was present when the defendant made his confession, and that the defendant had been released on parole. ***Id.*** Defense counsel

> made no objection to this evidence. In fact, in his opening statement, [defense counsel] described his client as a convicted felon who had spent much of his life in jail . . . After [the defendant] took the witness stand in his own

defense, [defense counsel] elicited testimony from [the defendant] indicating that he had prior criminal convictions for aggravated assault, forgery, and two robberies . . . [The defendant] further explained that he was currently on parole for robbery. [Defense counsel] never requested nor did the trial judge give a cautionary instruction regarding the jury's use of the foregoing evidence.

*Id.* (citations omitted).

The jury found the defendant guilty of multiple felonies, and this Court affirmed his judgment of sentence. *Id.* at 450. The defendant filed a PCRA petition which the court granted on the basis of ineffective assistance of counsel. *Id.* This Court affirmed, reasoning that defense counsel had no reasonable basis for allowing the evidence relating to the defendant's parole status and history of crimes that did not involve dishonesty:

> The Commonwealth . . . contends that [defense counsel] had a reasonable basis for his actions. The Commonwealth asserts that [the defendant]'s parole status needed to be introduced to explain [his] parole officer['s] presence at [the defendant]'s confession and the manner in which the police obtained [the defendant]'s photograph. Moreover, the Commonwealth maintains that [defense counsel] had a reasonable basis for eliciting testimony from [the defendant] regarding his previous convictions because this questioning was part of a trial strategy to establish that, despite [the defendant]'s criminal history, he was not guilty of the crimes charged.
>
> . . . [T]he evidence relating to [the defendant]'s parole status had no probative value and carried a material prejudicial impact. Such evidence did not relate to the crimes charged and was not a necessary part of the Commonwealth's case. The manner in which the police acquired [the defendant]'s photograph would not assist the jury in evaluating the evidence, and contrary to the Commonwealth's assertion, it was not necessary to apprise the jury of [the parole officer's] relationship with [the

defendant]. Rather, by permitting the Commonwealth to indicate that [the defendant] was on parole, [defense counsel] enabled the jury to infer that [the defendant] had been involved in other criminal activity. This evidence would tend to lead a jury to conclude that [the defendant] would be likely to have committed the crimes in question. *See* ***Commonwealth v. Sanchez***, [] 595 A.2d 617, 620 ([Pa. Super.] 1991) (noting that references to the defendant as an illegal alien were prejudicial because they permitted the jury to infer that the defendant was prone to engage in criminal conduct).

Furthermore, while the Commonwealth could have introduced [the defendant]'s robbery and forgery convictions as *crimen falsi* to impeach [the defendant]'s testimony, [the defendant]'s aggravated assault conviction could not have been used for impeachment purposes. ***See generally Commonwealth v. Yarris***, [] 549 A.2d 513, 521 ([Pa.] 1988) (noting that a witness may be impeached by evidence that he has prior *crimen falsi* convictions, meaning those that bear on a witness's honesty and truthfulness, such as robbery or theft). Though defense counsel may seek to introduce evidence of the defendant's prior convictions in an effort to prevent the prosecution from first bringing out such evidence on cross-examination of the defendant, before doing so, counsel must be convinced that the evidence is available to the prosecution to impeach the defendant. ***Commonwealth v. Zapata***, [] 314 A.2d 299, 301 ([Pa.] 1974) (holding that because the defendant's prior voluntary manslaughter convictions were not competent evidence in his trial on charges of aggravated assault, and because the defense "rested squarely" on the credibility of the defendant's own testimony, trial counsel rendered ineffective assistance by introducing evidence of these convictions).

Here, because [the defendant]'s previous aggravated assault conviction is not in the nature of *crimen falsi* and does not fall within the exceptions related to other crime evidence, the Commonwealth could not have introduced this conviction. ***See Commonwealth v. Seiders***, [] 614 A.2d 689, 692 ([Pa.] 1992) (awarding the defendant a new trial where the defendant's previous sexual assault convictions were admitted in his trial for sexual assault and

no exception permitting the introduction of such evidence applied). Nor is it apparent how such a strategy of introducing [the defendant]'s criminal history, which evidenced a pattern of conduct that resembled the charges against him, would be beneficial to [the defendant]'s case. Indeed, [the defendant]'s defense relied heavily on his own credibility, and evidence of his prior crimes could do nothing but undermine his testimony. **See Commonwealth v. Bond**, [] 396 A.2d 414, 418 ([Pa. Super.] 1978)(granting a new trial on grounds that the defendant's credibility was improperly undermined in his trial on robbery and assault charges, by evidence that the defendant had previously attempted to extort money from the victim). A jury, viewing the evidence in light of [the defendant]'s aggravated assault conviction, would likely conclude that because [the defendant] had previously been convicted of aggravated assault, he had a propensity to commit crimes of violence such as those perpetrated [in this case]. After considering the nature of the references to [the defendant]'s criminal history and due to the fact that these references were extensive, we agree with the PCRA court that [defense counsel] lacked a reasonable basis for his actions . . . **See also Commonwealth v. Holloman**, [] 621 A.2d 1046, 1051 ([Pa. Super.] 1993) (holding that the defendant was entitled to a new trial where in his trial on robbery charges, the prosecution introduced evidence establishing that drugs had been found in his residence; the prior crimes evidence had no probative value and only served to damage the defendant's character).

*Id.* at 451-52.

Second, in **Commonwealth v. Candia**, 428 A.2d 993 (Pa. Super. 1981), on direct examination, defense counsel asked the defendant, who was charged with possession with intent to deliver ("PWID"), whether he had ever been convicted of a crime. **Candia**, 428 A.2d at 996. Defense counsel's purpose in asking this question was to "demonstrate [the defendant's] honest recollections of past criminal acts [and] to prove [the

defendant] credible." *Id.* The defendant answered that he had pleaded guilty to a marijuana charge, which opened the door for the Commonwealth to "ridicule[] his character with the introduction of his past drug-related criminal activity." *Id.* The trial court, sitting without a jury, found the defendant guilty of PWID. *Id.*

This Court reversed and remanded for a new trial on the basis of ineffective assistance:

> Trial counsel's strategy in seeking this testimony was grossly inappropriate for the purposes he sought to achieve. The right to full cross-examination which does not go beyond the scope of the direct examination is guaranteed . . . Trial counsel's decision to question the appellant about his past criminal acts served only to invite very damaging cross-examination by the Commonwealth.
>
> Certainly, trial counsel, who was effective, would not have placed [the defendant] on the stand under a theory so tenuous as to believe admission of previous criminal acts would demonstrate credibility. Even if so incredible a theory were possible, no reasonable strategy would follow which included the invitation to the Commonwealth to use evidence of previous convictions against the appellant.

*Id.*

*Moore* and *Candia* illustrate the risk, and sometimes the outright folly, of allowing irrelevant prior crimes into evidence based on the notion that it will enhance the defendant's credibility, or diminish a prosecution witness's credibility, in the eyes of the factfinder. Perhaps this strategy is reasonable when the prior crimes are mundane and the use of this evidence will expose the Commonwealth witness as a prevaricator. Even then, this

approach is dangerous, as **Moore** and **Candia** demonstrate. But if the prior crimes are as shocking as these, the odds increase exponentially that the jury will focus on the incendiary facts and ignore any message about credibility that defense counsel wants to convey. That is what happened here. While defense counsel hoped Ziegel's testimony about Appellant's prior murders would make Ziegel look like a liar, the inflammatory "hot shot" evidence made Appellant look like a hardened murderer. No reasonable attorney would have employed a strategy that was so susceptible to backfiring.

In addition, defense counsel eschewed an alternative that "offered a potential for success substantially greater than the course actually pursued." **Colavita**, 993 A.2d at 887. The Commonwealth violated Pa.R.E. 404 by failing to provide advance notice of its intent to use the "hotshot" evidence or Appellant's order for Adderley to commit murder. **See** Pa.R.E. 404(b)(3) ("[i]n a criminal case, the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial"). Moreover, this evidence does not appear to be admissible under Pa.R.E. 404(b)(2).[8] Consequently, when the

---

[8] Pa.R.E. 404(b)(2) provides that "other acts" evidence may be admissible to prove, *inter alia*, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Moreover, "in a criminal
*(Footnote Continued Next Page)*

Commonwealth adduced this evidence during Ziegel's direct examination, defense counsel should have moved for a mistrial due to lack of notice, lack of relevance and potential for unfair prejudice. Pa.R.E. 404(b)(2), (3). The trial court probably would have granted this motion, given its visceral "ouch" reaction to this evidence, and even if it had denied this motion, Appellant would have had meritorious grounds for seeking a new trial on direct appeal.

### 3. Prejudice

This evidence prejudiced Appellant because it "could have reasonably had an adverse effect on the outcome of the proceedings." ***Spotz***, 84 A.3d at 315. As stated above, this evidence could not help but poison the jury against Appellant. Without this evidence, multiple discrepancies in the testimony of key prosecution witnesses would have made the case substantially more difficult for the Commonwealth to win. The three main Commonwealth witnesses—Ziegel, McCray, and Washington—did not agree on the reason that they traveled to Adderley's residence in Somerset County. Ziegel testified that the purpose of the visit was to rob Adderley; Washington testified that their purpose was to rob Adderley and then murder him "for free"; and McCray testified that Appellant told them to murder Adderley and take $50,000 or $60,000 from another apartment as payment.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

case, [other acts] evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." ***Id.***

Ziegel testified that he pucked up fake cocaine with Appellant in order to defraud Adderley. McCray, however, testified that the pucked-up cocaine was real, but fake cocaine ended up at the murder scene. In addition, Ziegel's description of his rise within Appellant's organization was at odds with his inability to avoid getting arrested. To hear Ziegel tell it, he received promotions or favors every time that he wound up behind bars—hardly the record of a star performer in a criminal enterprise. Finally, Ziegel testified that Appellant and Adderley appeared to be on good terms just days before the murder; they had gone to Coney Island together, barbecued together, and otherwise enjoyed one another's company. Absent the evidence of the unrelated murders, we think it possible that defense counsel might have been able to persuade the jury to reach a different verdict on the basis of these inconsistencies. Without the "hot shot" evidence, the jury might have found that Appellant lacked the intent to murder or conspire to murder Adderley and acquitted Appellant of murder and conspiracy.

The corrupt organizations verdict might have changed as well. The corrupt organizations charge required the Commonwealth to prove a "pattern of racketeering activity," that is, "a course of conduct requiring two or more acts of racketeering activity." 18 Pa.C.S. § 911(b)(3) & (h)(4). Murder is an "act of racketeering activity." 18 Pa.C.S. § 911(h)(1)(i). The two alleged acts of racketeering in this case were "illegally possessing and distributing controlled substance[s]" and "the homicide." N.T., 4/12/12, at

53 (jury instructions). Thus, had defense counsel convinced the jury to acquit Appellant on the murder charge, it likely would have acquitted him on the corrupt organizations charge as well due to the lack of a pattern of racketeering activity.

The verdict on the charge of criminal use of a communication facility might also have changed. The Crimes Code provides: "A person commits a felony of the third degree if that person uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title or under . . . [t]he Controlled Substance, Drug, Device and Cosmetic Act." 18 Pa.C.S. § 7512(a). The trial court instructed the jury that it could find Appellant guilty if it determined that he used his cell phone to "facilitate . . . the commission of the crimes of distribution of a controlled substance **and homicide**." N.T., 4/12/12, at 60 (emphasis added). Thus, a different decision on the murder charge might have changed the verdict under section 7512 as well.

Finally, with regard to the charge of sale of a non-controlled substance, our lack of confidence in the verdicts on the other charges influences us to order a new trial on this charge as well.

## CONCLUSION

Appellant raises multiple additional claims of ineffective assistance in his brief, but we need not address them in view of our decision to grant him a new trial based on the issue examined above. We therefore reverse the PCRA court's order denying relief and remand for a new trial on all charges.

Order reversed. Judgment of sentence vacated. Case remanded for new trial. Jurisdiction relinquished.

Judge Ott Joins.

Judge Moulton Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/26/2017